IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHARLIE ARCHULETA,

    Plaintiff,

v.                                                            CV 12-1078 WPL

CAROLYN W. COLVIN,
Acting Commissioner of Social Security Administration,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

    Charlie Archuleta filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments on July 13, 2009. (Administrative Record ("A.R.") at 131, 135.) He alleged that he had been disabled from June 19, 2009,[1] due to pain in his back, neck, and shoulder related to his lack of a left hand. (A.R. at 154.) Administrative Law Judge ("ALJ") Barry O'Melinn held a hearing on his applications on February 15, 2011. (A.R. at 13.) He determined that Archuleta was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (A.R. at 24.) Both applications were denied. (*Id.*) Archuleta requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (A.R. at 1-3.)

    Archuleta sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 17). The Commissioner of the SSA ("Commissioner") responded (Doc. 18), and Archuleta filed a reply (Doc. 19). Pursuant to 28 U.S.C. § 636(c) and Federal

---

[1] It appears that the SSA previously denied DIB payments to Archuleta on May 8, 1992. (A.R. at 150.) References made to any medical documents or claims dating from before June 19, 2009, are done for historical reasons and are not intended to reopen any prior claim.

Rule of Civil Procedure 73(b), the parties have consented to have me serve as the presiding judge and enter a final judgment. (Doc. 15.) After having read and carefully considered the entire record and the relevant law, I conclude that the ALJ did not err and will therefore deny the motion to reverse or remand.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920 (2013). If a finding of disability or nondisability is directed at any point,

the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Archuleta, age forty-two, worked as a laborer and heavy equipment operator for eight years (A.R. at 46, 155), then worked primarily as a truck driver for nine more years (A.R. at 31, 155). He left his job as a truck driver in June 2009 to take time off for his daughter. (A.R. at 32, 220.) More recently he has also worked as a foster care parent. (A.R. at 33, 47.) His potential disability onset date was June 19, 2009. (A.R. at 15.)

Archuleta was born with a congenital abnormality of his left hand; while he is "able to use it to a degree," he has no usable digits on that hand. (A.R. at 221.) He also suffers from degenerative disc disease and associated pain in his lower back (A.R. at 237), and his height and weight support a designation of obese (A.R. at 16; *see also* A.R. at 249). Archuleta also claims to suffer from an impairment of his right shoulder, which he attributes to overcompensation for his

congenital left-hand abnormality. (*E.g.* A.R. at 251-52.) It is this latter alleged impairment that forms the basis for this motion to remand.

Archuleta applied for DIB and SSI payments on July 13, 2009, claiming that his ability to work was limited by his lack of a left hand and by pain in his back, neck, and shoulder. (A.R. at 152, 154.) On August 28, 2009, Archuleta underwent a physical examination by Nurse Practitioner Susan Wayne, presenting with back and shoulder pain. (A.R. at 237.) Wayne observed spinal tenderness and deformity in the left forearm, but no other musculoskeletal abnormalities. (*Id.*) She diagnosed Archuleta with low back pain and shoulder bursitis/tendinitis, prescribed ibuprofen for pain relief, referred him to a physical therapist, and sent him for an x-ray of his shoulder. (A.R. at 238.)

Wayne met with Archuleta for a follow-up appointment two weeks later to review his lab and x-ray results. (A.R. at 239.) Although Archuleta's progress report from that appointment does not directly mention the results of his x-ray, notes from elsewhere in the record indicate that the x-ray was negative as to any shoulder abnormalities. (*See* A.R. at 224.) Wayne observed at the time that Archuleta had not been to physical therapy as recommended. (A.R. at 239.) She continued his ibuprofen prescription and recommended dietary changes, exercise, fish oil, and physical therapy. (A.R. at 239-40.)

Archuleta next underwent a consultative examination by Jordan K. Davis, M.D., neurosurgeon, at the request of the SSA. (A.R. at 220-23.) At the October 20, 2009 examination, Archuleta complained of, *inter alia*, right shoulder pain that was particularly associated with elevation of the right arm. (A.R. at 220.) He told Dr. Davis that his shoulder had been x-rayed about a month earlier and that he was told that he had problems with his rotator cuff. (*Id.*) Dr. Davis recorded pain in the abduction of Archuleta's right shoulder, particularly when the arm

was elevated, and noted tenderness in the right bicipital tendon. (A.R. at 221.) Dr. Davis concluded Archuleta's shoulder discomfort "may well be a biciptal tendinitis, which could be treated with an injection," but he conceded that Archuleta's conditions had not been firmly diagnosed. (A.R. at 222.) He recommended that an MRI be performed if injections did not relieve Archuleta's discomfort. (*Id.*) A consultative x-ray performed the next day revealed back abnormalities but was negative with respect to Archuleta's right shoulder, an assessment that was regarded as "unchanged" from Archuleta's August 2009 x-ray. (A.R. at 224.)

On November 11, 2009, Archuleta's RFC was assessed by non-examining consultative physician Eileen M. Brady, M.D. (A.R. at 228-35.) Dr. Brady recorded Archuleta's claims of pain to abduction of the right shoulder and tenderness of the right bicipital tendon, but she observed that Archuleta's right shoulder was otherwise normal and that Archuleta had no problems using his right hand. (A.R. at 230-31.) With respect to exertional limitations, Dr. Brady determined that Archuleta could occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, and/or sit for six hours out of an eight-hour workday with normal breaks. (A.R. at 229.) With respect to postural limitations, Dr. Brady concluded that Archuleta could frequently perform all tasks except for climbing ladders, ropes, or scaffolding, which he could only be expected to do occasionally. (A.R. at 230.) Because of Archuleta's left-hand deformity and right-shoulder pain, Dr. Brady also assessed limitations on reaching, handling, or fingering items, recommending in particular that Archuleta reach overhead with his right arm "no more than frequently." (A.R. at 231.) She concluded by observing that the "restricting limitations" recorded on Archuleta's activities-of-daily-living form were "not supported by the objective evidence." (*See* A.R. at 233.) The next day, the SSA reached an initial determination that Archuleta was not disabled, stating that he had the capacity for light work. (*See* A.R. at 56-58.)

5

Wayne, the nurse practitioner, examined Archuleta again in January 2010, and while Archuleta presented with shoulder pain, his back pain was the primary focus of that visit. (A.R. at 241-42.) Archuleta conceded that he was relying on the ibuprofen prescription alone for relief and that he had not been attending physical therapy as recommended. (*See* A.R. at 241.) Wayne again recorded no abnormalities of the right shoulder, but she did assess Archuleta with sciatic neuralgia and lower back pain, and consequently she prescribed additional pain medications. (A.R. at 242.) She also referred Archuleta yet again for physical therapy. (*Id.*)

The SSA reconsidered its initial denial of DIB and SSI payments on May 11, 2010. (A.R. at 244.) It observed that no new medical evidence of record had been received at that time, so it reviewed the information previously acquired. (*Id.*) The SSA concluded that the light RFC determination was reasonable and affirmed its initial denial of DIB and SSI payments. (*Id.*)

In July 2010, Archuleta again visited Wayne with claims of severe pain in his lower back, right shoulder, and right elbow. (A.R. at 249.) Wayne observed decreased range of mobility in Archuleta's right arm and shoulder, with decreased grip in the right hand. (A.R. at 250.) Wayne diagnosed Archuleta as having myofascial pain, back pain, and radicular syndrome of the upper limbs. (*Id.*) She added an additional prescription to Archuleta's existing pain medications, referred him for an MRI, and once again referred him for physical therapy. (*Id.*)

In addition to revealing mild degenerative changes to his cervical spine, Archuleta's August 2010 MRI revealed findings consistent with a superior labral tear involving the biceps anchor site/SLAP lesion. (A.R. at 245-46.) Also revealed were a sentinel cyst associated with the musculotendinous junction of the infraspinatus complex, likely associated with a partial thickness tear of the infraspinatus tendon. (A.R. at 246.) The reviewing physician noted

6

tendinopathy of the infraspinatus, supraspinatus, and subscapularis tendons, and she suspected partial thickness tears of the subscapularis tendon. (*Id.*)

When Archuleta visited Wayne for a follow-up examination the next week, Wayne again noted a low range of motion in the right shoulder and assessed Archuleta with a biceps tendon rupture and other unspecified affections of the right shoulder region. (*See* A.R. at 247-48.) Wayne authorized a refill of Archuleta's ibuprofen prescription, recommended physical therapy, instructed Archuleta not to lift over twenty pounds, and referred him to an orthopedist. (A.R. at 248, 251.)

Anthony F. Pachelli, M.D., an orthopedist, examined Archuleta's right shoulder on September 20, 2010. (A.R. at 251, 255.) Dr. Pachelli observed "mild" tenderness in the anterior shoulder, pain associated with internal rotation with flexion at ninety degrees, and signs of impingement. (A.R. at 254.) External rotation was also limited to 55 degrees, a below-normal assessment. (*Id.*; *see also* Doc. 18 at 7 n.3.) Still, Dr. Pachelli observed no swelling, effusion, masses, crepitation, calor, instability, trigger points, or palpable defects, and he assessed Archuleta as having normal muscle tone and full strength in external and internal rotators, the supraspinatus, the deltoid, the pectoralis, and the biceps. (A.R. at 254.) Dr. Pachelli diagnosed rotator cuff degeneration, a lesion of the superior glenoid labrum, and a spinoglenoid cyst. (A.R. at 255.) He recommended conservative care and rehabilitation exercises, and he administered a steroid injection in Archuleta's right shoulder. (*Id.*) He expressly did not recommend surgery, though he left the option open for the future. (*Id.*) Archuleta later stated at his hearing that he avoided surgery because it would leave him without any use of his hands for an extended period of time (A.R. at 39), though this reasoning is not reflected in Dr. Pachelli's notes (A.R. at 255).

Archuleta subsequently attended twenty-one physical therapy sessions through the remainder of 2010. (A.R. at 257.) At his discharge on December 29, 2010, Archuleta's physical therapist stated that Archuleta was experiencing less pain and improved strength and mobility in his shoulder, and she observed that his therapy had plateaued. (*Id.*) Although Archuleta's external and internal active range of motion remained short of his goals and he continued to possess strength deficits, he had shown substantial improvement in flexion and abduction active range of motion, and his overall range of motion was assessed as "normal." (*Id.*) The therapist recommended that he continue with home exercises. (*Id.*)

In January 2011, almost a month prior to his hearing before the ALJ, Archuleta underwent a second MRI. (A.R. at 280.) However, this test focused on Archuleta's lumbar spine, and no abnormalities with respect to his right shoulder were examined or noted. (*Id.*) There is no other medical evidence on record indicating that Archuleta sought medical treatment for his shoulder pain after his physical therapy discharge.

### HEARING TESTIMONY

On February 15, 2011, the ALJ held a hearing at which both Archuleta and a vocational expert ("VE") testified via video. (A.R. at 13.) Archuleta stated that he was able to lift up to fifteen or twenty pounds with his right arm before he started to feel shoulder pain and that he could only do so two or three times a day; he felt unable to lift much weight any more frequently than that. (A.R. at 34, 39-40.) He noted that he had suffered from aching in his arm for "a very long time" while working as a truck driver and that he still felt pain just from lifting his right arm. (A.R. at 31, 33.) Although medication reduced his pain by sixty to seventy percent, the pain remained significant, and the medication caused him to become drowsy. (A.R. at 40, 41-42.) After he left his work due to his daughter's medical condition, he looked for other driving jobs

8

but concluded that they required too much lifting. (A.R. at 36.) He also looked for work as a mechanic for a while, but "then I figured I could try and do this [apply for DIB and SSI payments]," and he ended the job search. (*Id.*)

The ALJ and Archuleta's attorney next questioned the VE, Cornelius J. Ford, regarding Archuleta's past work history and his future work ability. (A.R. at 47-53.) The ALJ first asked the VE if a hypothetical person of Archuleta's age, education, and work experience could perform any work if he were limited to light exertional work, with a sit/stand option every thirty minutes and occasional postural changes, provided that this person could only occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds. (A.R. at 48.) The VE responded that work existed for such a person, citing positions as a potato chip sorter, a cannery worker, and a parking lot attendant or cashier. (A.R. at 48-49.) When the ALJ added to this hypothetical situation an additional limitation that such a person be unable to perform fine manipulation with the left hand, the VE stated that the person could perform the same work. (A.R. at 50-51.) However, when the ALJ added to this second hypothetical the additional limitations of only occasional reaching and gross manipulation with the right hand and arm, the VE testified that there would not be a significant number of jobs available to such a person. (A.R. at 50.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Archuleta's claim pursuant to the five-step sequential evaluation process. (A.R. at 14-15.) He first determined that Archuleta had not engaged in substantial gainful activity since his onset date. (A.R. at 15.) He then found that Archuleta suffered from three severe impairments: a congenital deformity of the left hand, degenerative disc disease in the lumbar spine, and obesity. (*Id.*) In doing so, the ALJ expressly concluded that any impairment of Archuleta's right shoulder did not qualify as severe, noting that surgery had not

been recommended and that the impairment was being well-managed by physical therapy and home care. (A.R. at 16-17.) Next, the ALJ concluded that Archuleta did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1 of the SSA's Regulations, so he proceeded to evaluate Archuleta's RFC. (A.R. at 18.)

In reviewing the record, the ALJ primarily discussed evidence from Archuleta's treating medical sources. (A.R. at 19-22.) Having done so, the ALJ observed that Archuleta's treatment had been "essentially routine and/or conservative in nature." (A.R. at 16, 21.) The ALJ also noted that medication had been "relatively effective" in controlling Archuleta's impairments and significantly reducing his pain, and he commented that there was no evidence of any significant deterioration in Archuleta's medical condition since he left his job, which Archuleta had been adequately performing at the time. (*Id.*) He also pointed out that Archuleta had left his job for "non-medical reasons," namely his daughter's medical condition, and that he had looked for similar work after doing so. (*Id.*) He also noted that Archuleta's left-hand deformity had not prevented Archuleta from performing work-related activities in the past, and he recognized that none of Archuleta's treating or examining physicians had expressly concluded that Archuleta was disabled. (*Id.*)

Based on his findings, the ALJ concluded that Archuleta possessed an RFC to perform "light work" with a sit/stand option every thirty minutes; to occasionally climb ramps and stairs; to not climb ladders, ropes, or scaffolds; and to not engage in handling, fingering, feeling, or overhead reaching with the left hand. (A.R. at 18.) He did not assign any restrictions as to Archuleta's use of his right upper extremity, and he deemed Archuleta's claims regarding the intensity, persistence, and limiting effects of his symptoms as not credible to the extent that they were inconsistent with the RFC. (A.R. at 21.) He also decided not to give great weight to the

non-examining consulting physicians' opinions, as the remaining evidence supported a finding of more severe postural limitations and greater limitations on Archuleta's left arm and hand. (A.R. at 22.)

Relying on this RFC, the ALJ concluded that while Archuleta could not perform any of his past relevant work, he was able to perform other jobs that exist in significant numbers in the national economy. (A.R. at 22-23.) On that basis, the ALJ determined that Archuleta was not disabled under the meaning of the Social Security Act and not entitled to benefits. (A.R. at 24.)

Archuleta appealed the decision to the Appeals Council (A.R. at 126-27) and submitted new medical records from Dr. Pachelli dated November 22, 2010, which pre-dates the termination of Archuleta's physical therapy. (A.R. at 128-30). With respect to Archuleta's right shoulder, Dr. Pachelli's new analysis was essentially unchanged from his September 2010 discussion. (*Compare* A.R. at 129, *with* A.R. at 254.) The Council found that Archuleta's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner. (A.R. at 1.)

### DISCUSSION

Archuleta raises a single challenge to the ALJ's decision to deny benefits – that his failure to recognize limitations related to a right upper extremity impairment was not supported by substantial evidence. (Doc. 17 Ex. 1 at 8.) However, he claims that this error occurred at two points – when the ALJ did not recognize his impairment as severe, and when the ALJ failed to include restrictions against the use of his right arm in the RFC. (*Id.* at 9.) These claims implicate different stages of the sequential evaluation process, which I consider in order.

**I.     Step Two**

Archuleta claims that the ALJ's failure to recognize his impairment as severe was not supported by the record (*id.*), a claim that falls within the second step of the sequential evaluation process. Generally speaking, step two is a threshold step that is simply meant to "weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009) (unpublished) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J. concurring)). At this step, all the ALJ is required to do is determine whether the claimant suffers from one or more severe impairments in order to ensure that review proceeds to the next step. *See Oldham v. Astrue*, 509 F.3d 1254, 1256 (10th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (ending the analysis only "[i]f you do not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe"); *see also Dray*, 353 F. App'x at 149 ("[T]he failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe."); 20 C.F.R. §§ 404.1523, 416.923 (noting that when determining the medical severity of multiple alleged impairments at step two, the SSA considers the effects of the impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity").

Although the ALJ did not find Archuleta's shoulder impairment to be severe, he did find at step two that Archuleta suffered from three severe impairments, then proceeded to step three. (A.R. at 15-17.) That is all he was required to do at this step. *See Dray*, 353 F. App'x at 149

(citing *Oldham*, 509 F.3d at 1256).[2] Therefore, the ALJ did not err in failing to find Archuleta's right shoulder impairments to be severe at step two.

## II.     Step Four

Even after concluding that an alleged impairment is not severe, the ALJ must nonetheless consider the limiting effects of that and other impairments in determining a claimant's RFC. 20 C.F.R. §§ 404.1545(e), 416.945(e). The ALJ's evaluation of a claimant's physical and mental RFC constitutes the first of three phases of the step-four analysis. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citing *Winfrey*, 92 F.3d at 1023). In determining a claimant's physical abilities, an ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b), 416.945(b).

Having reviewed Archuleta's medical history and testimony, the ALJ determined that Archuleta had an RFC for light work, with a sit/stand option every thirty minutes, limitations on climbing, occasional postural changes, and no handling, fingering, feeling, or overhead reaching with the left hand. (A.R. at 18.) Archuleta does not challenge these limitations. Rather, he claims that the ALJ erred by failing to include additional restrictions on the use of his right arm in the RFC. (Doc. 17 Ex. 1 at 9.) Although Archuleta challenges multiple individual aspects of the

---

[2] Archuleta argues in his reply that *Dray* and *Oldham* are distinguishable in that the ALJs in those cases considered the omitted impairments at subsequent steps of the sequential evaluation process. (Doc. 19 at 6-7.) However, the ALJ here discussed Archuleta's claims of shoulder discomfort and pain at various points throughout his RFC determination. (*See* A.R. at 19-21.) As discussed elsewhere in this Opinion, the ALJ also effectively imposed a lifting restriction of twenty pounds during the RFC analysis, basing this limitation expressly on a medical assessment of Archuleta's shoulder. (*See* A.R. at 21-22 (citing A.R. at 248).) It is therefore apparent that "the ALJ properly considered the impairment omitted at step two in subsequent steps of the disability determination." (*See* Doc. 19 at 6-7; *see also Fischer-Ross v. Barnhart*, 431 F.3d 729, 731, 733-34 (10th Cir. 2005) (rejecting remand when a decision, read as a whole, demonstrates that the ALJ sufficiently considered the impact of an alleged impairment on the claimant's potential disability).)

ALJ's analysis, the essence of his objection is that any evidence showing that Archuleta's right shoulder impairment was "vocationally insignificant" is overwhelmed by evidence to the contrary. (*Id.* at 13.)

   *A. Substantial Evidence*

The ALJ's decision with respect to Archuleta's shoulder rested on a number of observations from the medical evidence and Archuleta's own testimony. He noted that Dr. Pachelli had recommended against surgery, opting instead for "conservative care," specifically physical therapy, home exercises, and medication. (A.R. at 16.) The ALJ also remarked that two x-rays from the relevant period showed no abnormalities. (*Id.*) Physical therapy had improved the strength in Archuleta's shoulder, his range of motion was considered normal, and Archuleta was discharged to continue with home exercises. (*Id.*) Further, the prescribed medications were effective, reducing Archuleta's pain by sixty to seventy percent. (*Id.*; *see also* A.R. at 21.) Archuleta's previous work as a truck driver ended for reasons unrelated to his alleged impairments, and if anything the medical evidence suggested an improvement in his shoulder condition since that time. (A.R. at 16, 21.) Moreover, the evidence did not suggest that Archuleta could not perform his work-related duties; indeed, Archuleta had worked in several strenuous positions in the past, and he testified that he actively looked for similar work after losing his previous job. (A.R. at 21.)

Archuleta contends that the evidence supporting his claim of disability overwhelms the ALJ's findings based on these considerations. (Doc. 17 Ex. 1 at 13.) He notes that he was diagnosed with shoulder bursitis/tendinitis and possible bicipital tendinitis, with an MRI showing tendon tears and a paralabral cyst, and that Dr. Pachelli provided a steroid injection after noting signs of impingement and shoulder tenderness. (*Id.* at 10.) Though medication drastically

14

reduced his pain, Archuleta still testified that his pain remained significant. (*Id.*) He also points out that while physical therapy improved his strength and range of motion, he was still suffering from deficits in his right shoulder once the therapy plateaued. (*Id.*) Further, consulting non-examining physician Dr. Brady concluded that Archuleta could only perform light work that required no more than frequent overhead reaching. (*Id.*) Finally, although Dr. Pachelli recommended against surgery, Archuleta testified that this decision stemmed from the burdens that surgery would place on him due to his existing congenital deformity. (*Id.*)

It is clear that evidence exists to support both Archuleta's position that he is disabled and the ALJ's position that he is not. Under these circumstances, another ALJ could conceivably have weighed the evidence before him and reached a different conclusion. However, I may not reweigh this evidence myself, *Hamlin*, 365 F.3d at 1214; the standard by which this reviewing Court is bound is not whether the ALJ's decision is supported by a preponderance of the evidence, but whether it is supported by substantial evidence, *U.S. Cellular Tel.*, 340 F.3d at 1133. Unless the ALJ misapplied the law in considering a significant portion of the evidence before him, a reasonable mind would conclude that adequate evidence existed to support his conclusions. *Id.*; *see also Hamlin*, 365 F.3d at 1214.

### B. Application of Correct Legal Standards

Archuleta attacks several of the ALJ's findings that supported a determination of nondisability. First, he challenges the ALJ's reliance on the fact that surgery was not recommended, observing that a finding of disability should not be limited to situations where surgery is required. (Doc. 17 Ex. 1 at 11 (quoting *Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003)).) While this statement is correct, a claimant's lack of surgery is nonetheless "a legitimate consideration for the ALJ's analysis" in gauging the severity of a claimant's

15

impairments. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012). Here, the ALJ cited Dr. Pachelli's recommendation against surgery as one aspect of the "conservative care" pursued by Archuleta's treating and examining medical providers, and the treatment prescribed for a claimant is a valid consideration in reaching a disability determination. *See, e.g.*, 20 C.F.R. §§ 404.1529(a), 416.929(a). Further, although Archuleta testified that the decision to avoid surgery was related to the potential impact of surgery on his other symptoms and impairments, the ALJ determined that Archuleta's statements regarding the intensity, persistence, and limited effects of his symptoms were not fully credible (A.R. at 21), a finding that Archuleta does not dispute. As such, the ALJ did not err in considering Archuleta's prescribed treatment when reaching his disability determination.

Next, Archuleta complains that the ALJ did not sufficiently discuss the opinion of Dr. Brady, the consultative physician who recommended a manipulative limitation that the ALJ ultimately did not adopt. (Doc. 17 Ex. 1 at 12.) An ALJ, while not required to discuss all evidence, "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (examining an ALJ's obligations at step three). Archuleta alleges that the ALJ erred in failing to explain why he did not adopt Dr. Brady's opinion that Archuleta should "reach overhead no more than frequently." (Doc. 17 Ex. 1 at 12-13 (citing A.R. at 231).)

However, Dr. Brady's recommended limitation was neither uncontroverted nor significantly probative. For example, Archuleta's physical therapy records indicate that he possessed "normal" range of motion at the conclusion of his therapy, a finding that is inconsistent with, and more recent than, Dr. Brady's non-treating, non-examining assessment. (A.R. at 257.) Further, the ALJ expressly determined that Dr. Brady's RFC analysis could not be

accorded great weight, as it was inconsistent with the limitations supported by the medical evidence provided by Archuleta's treating and examining physicians. (A.R. at 22; *see also Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (finding that "the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all" relative to the opinions of treating and examining physicians (citations omitted)); SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996) (holding that SSA consultant opinions are only to be given weight "insofar as they are supported by evidence in the case record").) Having so concluded, it would have been anomalous for the ALJ to nonetheless "pick and choose" from Dr. Brady's opinion, relying on it where it supports a finding of disability while ignoring the aspects that weigh against such a finding.[3] *Cf. Robinson*, 366 F.3d at 1083 (prohibiting an ALJ from "using only those parts [of a physician's opinion] that are favorable to a finding of nondisability"). Because the ALJ had already found that Dr. Brady's opinion as a whole could only be considered somewhat probative, particularly in light of the contrary findings of Archuleta's treating and examining physicians, he was not required to discuss each aspect of her opinion in depth.

Archuleta also argues that the ALJ erred in limiting him to "occasional lifting of twenty pounds." (Doc. 17 Ex. 1 at 12.) In fact, the ALJ did not say that Archuleta could occasionally lift twenty pounds. Rather, the ALJ assessed Archuleta as having an RFC for "light work," which inherently sets an upper boundary of lifting no more than twenty pounds. *See* 20 C.F.R. § 404.1567(b). There is no indication in that RFC, or in any additional limitations set by the ALJ, that Archuleta be required to lift twenty pounds as much as "occasionally," that is, "from very little up to one-third of the time." *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Instead,

---

[3] I note this fact because the ALJ's decision to discount Dr. Brady's opinion ultimately weighed in Archuleta's favor, as Dr. Brady recommended a less restrictive RFC than that imposed by the ALJ. (*See* A.R. at 22.)

as the ALJ acknowledged, the weight limit is consistent with the medical opinion from Wayne, Archuleta's treating nurse practitioner, who recommended the restriction in August 2010 in light of Archuleta's shoulder complaints. (*See* A.R. at 21-22 (citing A.R. at 248).) This restriction is also consistent with Archuleta's own testimony, as he acknowledged that he could lift no more than twenty pounds. (A.R. at 34.) Finally, the restriction is consistent with Archuleta's progress following physical therapy, which occurred after Wayne imposed the twenty-pound limit and which showed modest strength gains in Archuleta's shoulder. (A.R. at 257.)

Undeterred, Archuleta contends in reply that although Wayne said that he could lift no more than twenty pounds, she did not affirmatively say that he could lift *less* than twenty pounds. (Doc. 19 at 4.) Therefore, Archuleta insists, there is no evidence on record indicating how frequently he can lift objects under twenty pounds. (*Id.*) This argument is nonsensical on its face. The ALJ may properly infer from a lifting restriction imposed by a treating, examining medical source that the claimant may lift objects of lesser weight. Although Archuleta quotes caselaw asserting that "[t]he absence of evidence is not evidence" (*see id.* (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993)), Wayne's twenty-pound lifting restriction constitutes sufficient evidence that Archuleta may lift under twenty pounds. Further, if additional evidence exists to support a lower weight threshold, the burden to eliminate this purported "absence of evidence" rests on Archuleta. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).

Finally, Archuleta claims that the ALJ erred in determining that Archuleta's shoulder impairment did not meet the twelve-month durational requirement for a finding of disability. (Doc. 17 Ex. 1 at 12.) Substantial evidence, in the form of several medical records from the relevant period suggesting that no shoulder impairment existed, would appear to support the ALJ's holding on this issue. (*See* A.R. at 224 (noting that x-rays from August 2009 and October

2009 were both negative as to shoulder problems); A.R. at 241-42 (reporting no objective assessment of shoulder pain and diagnosing no shoulder impairments in January 2010); A.R. at 257 (reporting normal range of motion in December 2010).) However, even if the ALJ erred on this question, such error would be harmless and could not serve as grounds for remand in light of the fact that substantial evidence otherwise supported the ALJ's finding of nondisability, regardless of whether the alleged shoulder impairment met the durational requirement. 20 C.F.R. § 498.224; *see also Barber v. Astrue*, 431 F. App'x 709, 713 (10th Cir. 2011) (unpublished).

The ALJ's RFC analysis was supported by substantial evidence – that is, more than a scintilla of evidence that was not overwhelmed by contrary evidence. *Hamlin*, 365 F.3d at 1214 (quotation omitted). Further, the ALJ applied the correct legal standards in reaching his RFC determination. *Winfrey*, 92 F.3d at 1019. Accordingly, I find no error at step four. Moreover, as Archuleta concedes that the SSA's step-five determination of nondisability hinged on whether his RFC had been correctly assessed (Doc. 17 Ex. 1 at 13), I conclude that the ALJ did not err in determining that Archuleta was not under a disability as defined by the Social Security Act.

## CONCLUSION

After thorough review of the entire administrative record, I conclude that the ALJ applied the correct legal standards and that his factual findings are supported by substantial evidence. Therefore, Archuleta's motion to reverse or remand is denied.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.